UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MONA C. TRACY and TERAH TRACY,  )
   )
     Plaintiffs/  )
     Counter-Defendants  )
   )
      vs.      )   CAUSE NO. 3:15-cv-212 RLM
   )
PAUL J. MINNE and JEAN M. MINNE,  )
   )
     Defendants/  )
     Counter-Plaintiffs  )

## OPINION AND ORDER

A December 30, 2010 meeting at the Kokomo, Indiana, Cracker Barrel played a pivotal role in the short life of a business called Phoenix Pallet. It was there that the original shareholders Mona and Terah Tracy and Mike and Tammy Madison first met Jean and Paul Minne, one whom would become a shareholder and the other president of the closely held corporation. The original shareholders hoped Mr. Minne and his money would save their business.

Phoenix Pallet manufactured, refurbished, and sold wood pallets. It was incorporated in February 2010 and was struggling by the time of the Cracker Barrel meeting. Mr. Madison had asked Phoenix Pallet's accountant, David Rushenberg, to keep an eye out for possible investors, and Mr. Rushenburg had suggested Mr. Minne, whose personal accounting work Mr. Rushenburg had done for years. That led to the December 2010 Cracker Barrel meeting.

Mr. Minne had put quite a bit of money into Phoenix Pallet even before the Cracker Barrel meeting. He had gone to Phoenix Pallet's Elkhart, Indiana facility,

looked at records, asked questions, and saw promise in the company. He put $50,000 into Phoenix Pallet in October 2010 and another $40,000 in November, through Mr. Madison. Mr. Minne was enthusiastic at the Cracker Barrel meeting. He expressed the belief that he could have Phoenix Pallet making a profit in six months and the shareholders' next annual meeting would be held in Las Vegas. Mr. Minne had two conditions that had to be met before he participated any further. First, since he would have the most money tied up in Phoenix Pallet, he insisted on being president. That condition seems to have been agreed to immediately. Second, he wanted to continue spending winters in Florida, where the Minnes had been going for Mrs. Minne's health. Again, all present agreed to that condition.

Not everyone at the Cracker Barrel had the same understanding of what it means to spend winters in Florida. The Madisons lived in Elkhart, Indiana, near the Michigan border. The Tracys lived in Terre Haute, Indiana. The Minnes lived about 150 miles north of the Tracys, in White Pigeon, Michigan. Maybe "winter" means something different to people from southern Michigan than it does to people southwest central Indiana, but the Tracys understood Mr. Minne to mean two or three months, and the Minnes had been spending five or six months in Florida.

Mr. Minne thinks he presented a third condition: that he be paid enough to be pay for his country club dues. The record doesn't support that belief. Both Tracys and both Madisons testified that they remember nothing about Mr. Minne being paid, and Phoenix Pallet's financial records don't reflect any salary

payments. The minutes say nothing about pay (though the minutes also said nothing about winters in Florida, either, and everyone agrees that was discussed). Mr. Minne's memory on this point is faulty.

The Cracker Barrel meeting participants agreed that Mrs. Minne would become a shareholder with one-third of the shares. The Minnes understood that the Tracys were silent partners, while the Madisons worked at Phoenix Pallet.

Despite the enthusiasm Mr. Minne brought to the Cracker Barrel meeting, Phoenix Pallet never made a profit, and closed with a crash slightly more than four years later.

The Tracys, citizens of the state of Indiana, and the Minnes, citizens of the state of Michigan, have sued each other on various state law claims. Well over $75,000 is in controversy, so the court has jurisdiction under 28 U.S.C. § 1332(a). The parties agree that Indiana law provides the rule of decision. A bench trial was held from August 13 through August 16, 2018. This memorandum is meant to satisfy the court's obligation under Fed. R. Civ. P. 52(a).

THE TALE OF PHOENIX PALLET

*2010*

When the Tracys and Madisons formed Phoenix Pallet, Mona Tracy and Tammy Madison were issued slightly more shares than their spouses in the event opportunities arose for a woman-owned business. Tammy Madison was named president. Even though the bylaws didn't provide for a position of vice-president, the shareholders immediately selected Mike Madison vice-president. Mr.

Madison was to run the plant while Mrs. Madison ran the office. The Tracys weren't strictly silent partners but wanted to stay in the shadows. Mrs. Tracy had her own business that supplied pallet manufacturers, and preferred that her role in Phoenix Pallet not become widely known.

Each couple put an initial investment into the business. The Tracys provided equipment worth $99,613 to Phoenix Pallet through a sale on credit at annual six percent interest rate. The Tracys also provided five computers. Phoenix Pallet leased a site that met all its needs, including electrical service, but might have been larger than needed (200 yard x 100 yards) at the company's outset. The company entered the market with one expected arm tied behind its back: Phoenix Pallet applied for a Small Business Association loan of $150,000 through 1st Source Bank, but was turned down and received a $50,000 line of credit instead; that rejection led both couples to put more money into the business for outstanding bills, paying themselves back as income came in. Mrs. Madison and Mrs. Tracy incurred Phoenix Pallet debt on credit cards.

As 2010 proceeded, it became apparent that Phoenix Pallet needed a source of more money. It had a net loss of about $145,000. Mrs. Madison wasn't able to keep the Tracys completely up-to-date on the financial information as she struggled with the accounting program the Tracys had provided, but the Tracys knew the company was struggling.

Mr. Rushenburg (Phoenix Pallet's accountant) told Mr. Madison that Mr. Minne might be interested in investing. Mr. Minne visited the Phoenix Pallet plant in Elkhart and the Madisons gave him free rein of the corporate records

and financial information. Based on those visits and examinations, Mr. Minne came to believe that Phoenix Pallet could become a successful undertaking if sales could be increased. Mr. Minne didn't discuss the investment with his wife. The Tracys didn't know of, and didn't object when they learned of, Mr. Minne's $90,000 investment.

The Kokomo Cracker Barrel meeting described at the outset of this opinion ensued. By the end of 2010, Mr. Minne was president of Phoenix Pallet, Mr. Madison was vice-president (notwithstanding the absence of mention of that office in the bylaws), and Mrs. Madison was secretary-treasurer. The Tracys, the Madisons, and Mrs. Minne each owned a third of the shares of Phoenix Pallet.

Mr. Minne believes he asked the Tracys whether the equipment they had provided to Phoenix Pallet was a capital contribution to the company or a loan on credit, and that they told him it was a capital contribution. He left the Kokomo Cracker Barrel meeting with the belief that the equipment was a capital contribution, and now says he wouldn't have invested had he known Phoenix Pallet didn't own that equipment. Mr. Minne's understanding was incorrect and he might have misunderstood what he was told. No other evidence in the case corroborates his memory; Mr. Tracy specifically remembers telling Mr. Minne the equipment was there on a six percent loan. The day before the Tracys met Mr. Minne for the first time at the Cracker Barrel meeting, Mr. Rushenberg produced an amortization schedule for the equipment. It doesn't appear that the Tracys shared the amortization schedule with Mr. or Mrs. Minne, but it's most unlikely

that the Tracys would have told Mr. Minne the equipment was a capital contribution with an amortization schedule in hand.

The Tracys, Madisons, and Minnes all moved forward with the hope that Phoenix Pallet would do better in 2011. Everyone honestly believed that Phoenix Pallet would be profitable if it could increase sales by $90,000. The Madisons returned to Elkhart, the Tracys returned to Terre Haute, and Minnes set out for Florida.

As of the end of 2010, Mr. Minne was the largest investor at $90,000. The Tracys had put in $68,900 and the equipment. The Madisons had invested $32,409.94.

Phoenix Pallet had $425,000 in gross sales in 2010 (a partial year of operation), and lost $179,000.

*2011*

The Tracys drew even more deeply into the shadows in 2011 as Mr. Tracy suffered two serious health issues, and Phoenix Pallet became a less significant factor in their lives. Mr. Minne didn't speak with the Tracys during all of 2011.

Back in Elkhart, Mrs. Madison worked less and less in the office as she took other jobs and another bookkeeper was hired. Mr. Madison continued to put in 60-hour weeks running the plant and, when Mr. Minne was away, running the business. Neither the Tracys nor the Madisons put more money into the business, but Mr. Minne made short-term advances totaling $183,000 during

the course of 2011. Sales increased dramatically from 2010 to 2011, rising to $1.24 million, but Phoenix Pallet continued to lose money.

Mr. Minne was an investor in three other businesses. Golf Properties was a real estate holding company. Elkhart Logistics and Fabric Technologies serviced the recreational vehicle industry. Golf Properties paid Mr. Minne a weekly management fee of $525 on Phoenix Pallet's behalf, and Phoenix Pallet reimbursed Golf Properties. Mr. Minne testified that he did this so Phoenix Pallet wouldn't be saddled with the payroll expenses connected with his management fee. Phoenix Pallet also used, while not paying for the use of, Elkhart Logistics trucks. At times, Fabric Technologies made loans to Mr. Minne, who in turn would pass the money along to Phoenix Pallet, and Phoenix Pallet would repay Fabric Technologies. As time went on and relationships soured, the Tracys would demand that Golf Properties and Elkhart Logistics be removed from the Phoenix Pallet facility, but nothing in the record suggests that anyone lost a penny by virtue of Mr. Minne's having involved his other businesses in the Phoenix Pallet enterprise.

As 2011 drew to a close, Mr. Minne realized he was the only one putting money into Phoenix Pallet and that Phoenix Pallet was likely to need more money from him to operate in 2012. He decided he wanted to protect his investment. He had an attorney draw up a promissory note and a security agreement for $200,000 (with annual interest at 5 percent) he thought he had put into the company. The attorney told Mr. Minne it would better if another officer signed on Phoenix Pallet's behalf, as opposed to Mr. Minne signing as both president

and creditor. When the Minnes were home from Florida for Christmas, he and Mr. Madison executed the note and security agreement, with Mr. Madison signing as vice-president. A copy of the note and security agreement were kept at the Phoenix Pallet office, and Mr. Minne had a UCC statement filed with the secretary of state's office.

Mr. Madison doesn't remember signing the papers, and given the thickness of the eleven-page security agreement, he thinks he would have read it and remembered it. The Tracys seem to think Mr. Minne used Mr. Madison's signature stamp to give himself a security interest in Phoenix Pallet. They point out that the signature on the note reads "Mike A. Madison," as "Vice President," and the file name at the bottom of the document reads, "msw\corp\phoenixpi-spn\jvw\amb. The security agreement is signed "Mike Madison" (again as Vice President), spells Mr. Minne's name correctly, and the characters within the signature are of significantly greater weight (thickness) than the signature affixed to the promissory note. The file name at the bottom of this document is "msw\agree\pmpp-secag\jvw\mj."

It is more likely than not that Mr. Minne didn't forge Mr. Madison's signatures. First, testimony from both Madisons indicate that it wouldn't have been unusual for Mr. Madison to sign as "Mike A." on one line and as "Michael" on another. Second, although the relationships between the shareholders and officer of Phoenix Pallet soon took a nosedive, they were fine at the end of 2011. Mr. Minne and Mr. Madison were working well together. At some time – maybe in 2011 – Mrs. Madison became uncomfortable with Mr. Minne's checkwriting

practices, but speculation is required to think Mr. Minne know that by the end of 2011. And the Tracys had been the mutest of silent partners to that point. Finally, the Madisons and Tracys hadn't put money into Phoenix Pallet for more than a year; they had chosen Mr. Minne to provide money. The Tracys and Madisons would have been hard pressed to deny Mr. Minne a security interest to the extent of his investment, and there's no basis to find Mr. Minne thought he had to go under the table to get a security interest.

Mr. Minne's method of handling the transaction didn't comply with the Phoenix Pallet bylaws. First, the bylaws didn't create an office of vice president, so strictly by the bylaws (and ignoring how Phoenix Pallet had operated since its creation), Mr. Madison couldn't sign as vice president. Second, the bylaws provide that, "[u]nless otherwise provided by the Board of Directors, all contracts, leases, commercial paper and other instruments in writing and legal documents, shall be signed by the President and attested by the Secretary. All bonds, deeds, and mortgages shall be signed by the President and attested by the Secretary. All certificates of stock shall be signed by the President and attested by the Secretary." The directors hadn't amended that provision or established another way to execute instruments of that sort. Mr. Minne had never seen the bylaws by the end of 2011; Mrs. Tracy had the bylaws.

No one told the Tracys about the promissory note and the security agreement.

Finally, it appears that the $200,000 figure referenced in the note was simply plucked from the air as a rough estimate of what Mr. Minne thought he

had put in by December 2011. Available records suggest that Mr. Minne's contributions in 2011 were closer to $170,000 than to $200,000, and had invested $90,000 in 2010. Some of what Mr. Minne put into Phoenix Pallet in 2011 was repaid. These were interest free short-term loans to tide the company over until revenue came in. Phoenix Pallet financial records are too fuzzy to tell with any degree of confidence how close the contributions and repayments came to evening out; Plaintiffs' Exhibit 37 indicates that Phoenix Pallet paid just under $17,000 directly to Mr. Minne and $42,000 through Golf Properties in 2011. That process of money-in-money-out continued through 2014.

Phoenix Pallet had $1,239,000 in sales in 2011 – a 290 percent increase over 2010 – but lost $149,000.


*2012*

The year 2012 saw sales increase, the Madisons step aside as officers and shareholders, and the Tracys emerge from the shadows.

Around April 2012, the Madisons notified the Tracys and the Minnes that they were going to file for bankruptcy. To keep their creditors from reaching Phoenix Pallet, they resigned their positions as officers and shareholders, and backdated their resignations to December 31, 2011. Mr. Madison remained at Phoenix Pallet as plant manager. He was paid $1,000 a week and ran the manufacturing facility and, when Mr. Minne was in Florida, he ran Phoenix Pallet. The Madisons signed a resignation form, as did the Minnes and the Tracys separately, all dated December 31, 2011. After the Madisons' resignation, Mrs.

Minne owned half the shares of Phoenix Pallet, and Mr. and Mrs. Tracy each owned a quarter.

Mrs. Madison had virtually left the Phoenix Pallet office because of her distaste for the way Mr. Minne handled the checkbook. Phoenix Pallet suffered chronic cash flow shortages, and the checking account often had too little to pay bills as they came due. Sometimes, Mr. Minne would make short-term loans to the company (as Mrs. Madison did once at tax time). At other times, though, he would send checks off to a creditor expecting that a check coming in from a debtor would hit the account first, providing sufficient funds for the company check. It didn't always work, and Phoenix Pallet incurred more than $21,000 in bounced check fees while Mr. Minne ran the business. Universal Machine, which Mrs. Tracy owned, appears to have been among the creditors paid with sounder checks. Sometimes, Mr. Minne would make what he viewed as a short-term loan to get the company over a stretch in which the receivables hadn't yet come in, then have the company repay him a few days later. On other occasions, Mr. Minne had checks sent out for amounts less than full payment, trying to buy time until the cash flow improved. As would be seen in 2014, that practice didn't always keep creditors at bay.

Mr. Tracy returned to health sometime early in 2012, and the Tracys increased their focus on Phoenix Pallet's financial health. Records that showed the company was still operating at a loss, and owing Mr. Minne $400,000, alarmed them, so they set up a July 2012 meeting with Mr. Minne, the Madisons, and Mr. Rushenburg. During that meeting, as Mrs. Tracy was examining

financial paperwork Mr. Rushenburg had given her, Mr. Rushenburg said Phoenix Pallet had more than one set of books, and the Tracys should call him if they wanted accurate information. When the Tracys responded to that statement with alarm, Mr. Rushenburg insisted that Mrs. Tracy return all the paperwork he had produced, including papers she already had placed in her briefcase. After Mrs. Tracy complied, Mr. Rushenburg left hurriedly, and Mr. Minne and Mr. Madison left as well.

Mrs. Tracy tried to get the "accurate" information from Mr. Rushenburg, but he wouldn't return her calls. She asked Mr. Minne, but he said he didn't hear Mr. Rushenburg say anything about a second set of books. Given the seating arrangement at the meeting and the conversation leading up to the statement, the Tracys can't believe that Mr. Minne didn't hear the statement. The Tracys contend that, assuming Mr. Minne heard the statement, his failure to dispute Mr. Rushenburg's statement amounts to an admission by Mr. Minne that Mr. Rushenburg's statement was true. *See* Fed. R. Evid. 801(d)(2)(B).

Based on the trial evidence, it's more likely than not that Mr. Rushenburg made the "more than one set of books" statement. Mr. Tracy and Mrs. Tracy both testified that they heard it; more significantly, Mrs. Madison (who gains nothing from this case) says she heard the statement, though she's not sure whether Mr. Rushenburg or Mr. Minne uttered it. Mr. Rushenburg didn't testify at trial. It is also more likely than not that Mr. Minne heard the statement. He was seated with Mr. Rushenburg to his left and Mrs. Tracy directly across from him. It's less

certain that the statement resonated with him as it did with the Tracys and Mrs. Madison.

Still, the record contains no substantive evidence apart from the adoptive admission that Phoenix Pallet maintained more than one set of books. No second set of books was introduced into evidence; Mr. Rushenburg (the Phoenix Pallet accountant) didn't testify to a second set; Mrs. Madison (who had been Phoenix Pallet's principal bookkeeper until a few months before this meeting) didn't testify to a second set; Mr. Madison (who ran Phoenix Pallet for about half the year) didn't testify to a second set; David Gray (who sort of replaced Mr. Rushenburg as Phoenix Pallet's accountant) didn't testify to a second set. Mr. Minne's failure to dispute Mr. Rushenburg's statement – itself not substantive evidence – stands alone as proof of multiple books.

It isn't more likely than not that Phoenix Pallet maintained more than one set of books. Nonetheless, Mr. Rushenburg's statement sent the relationship between the Tracys and Mr. Minne into a tailspin from which it never recovered. Mr. Tracy looked at Mr. Minne's claimed $400,000 investment as more money than the Board ever authorized Phoenix Pallet to accept. It's worth noting that the Board never authorized acceptance of the $90,000 Mr. Minne invested in 2010, and never returned the money.

Phoenix Pallet lost $39,000 on sales of $1,536,000 in 2012.

*2013*

The year 2013 saw more money put into by Phoenix Pallet by Mr. Minne, more unprofitability at Phoenix Pallet, and more disharmony between the Tracys and Mr. Minne.

Mr. Minne opened personal lines of credit with PNC Bank and Fifth Third Bank and used those accounts to make short-term loans to Phoenix Pallet, which would make repayments to the banks when it could. Phoenix Pallet also made payments, though very untimely ones, to American Express and Chase Bank on credit cards in the names of Mona Tracy and Tammy Madison that were taken out in 2010.

In June 2013, the parties began discussing the sale of either Phoenix Pallet or their interests in Phoenix Pallet. At one point later in the year, Terry Rodino considering buying the company but backed out when he learned that Phoenix Pallet didn't own its building.

The Tracys visited Phoenix Pallet's Elkhart facility a few times (fewer than five) and remained dissatisfied with what they were learning about the company. They called a directors meeting in Terre Haute in December and Mr. Minne (but not Mrs. Minne) attended. No one had a good explanation for the company's continuing unprofitability.

Near the end of 2013, 1st Source Bank wanted payment on a prior loan before approving any more financing. The bank wanted $50,000. The Tracys put in $25,000, the Minnes put in $15,000 and Phoenix Pallet put in $10,000. This was the first money the Tracys had put into Phoenix Pallet since 2010.

In December, Mr. Tracy told Mr. Minne that he and his wife were going to get more involved in the company's day to day operation. According to Mrs. Tracy's trial testimony, Mr. Minne had said at the 2010 Kokomo Cracker Barrel meeting that he wanted to be able to run the company without being nitpicked.

In 2013, Phoenix Pallet had $1,412,000 in sales, and a loss of $42,000.

## *2014*

Although Phoenix Pallet sales continued to increase, 2014 saw three major setbacks. First, its insurance was cancelled in January for non-payment of premiums. Phoenix Pallet had been making partial premium payments because of cash shortfalls and had fallen $10,240 behind. Mr. Minne explains that Phoenix Pallet bookkeeper David Gray was responsible for paying the insurance company, and that he (Mr. Minne) hadn't known of the arrearage. Phoenix Pallet was able to get replacement insurance, but the cost of the insurance was considerably higher.

Second, Phoenix Pallet's landlord terminated the lease for its facility in July, citing arrearages in rent payments. Mr. Minne and Mr. Madison believe the landlord had an offer from a third party to purchase the facility and accelerated the end of the lease, which was to expire on December 31, 2014. Production had to stop and equipment had to be moved to a less efficient facility that didn't have the sort of electrical service Phoenix Pallet needed. The Tracys blame Mr. Minne for not anticipating the need for a new facility at the lease's end; proper planning, they say, would have reduced the cost to the company of the interruption arising

from the relocation. This seems an unfair accusation: everyone involved in Phoenix Pallet hoped to sell the business and get out, perhaps with their money. The parties tried unsuccessfully to sell Phoenix Pallet to one of competitors, Blair Melvin. Burdening the business with a new, as yet unnecessary, lease would have made the business less marketable.

Third, there was what witnesses called a "supply war" in 2014. Competitors followed Phoenix Pallet trucks to vendors and offered the vendors more than Phoenix Pallet could afford to pay for a pallet. Phoenix Pallet had to find other vendors and went as far as Canada in that search.

The Tracys had been in the pallet business for many years before starting Phoenix Pallet, and Mr. Minne asked them to come to Elkhart, look things over for a few weeks, and see what they might suggest. Mr. Tracy went to Elkhart and left after two days, saying everything looked fine. Mrs. Tracy, who operated her own business in the field, never came.

In April, the Tracys offered to sell their interest in Phoenix Pallet to Mr. Minne for a non-negotiable price of $212,500.

The Tracys continued to believe they weren't seeing the whole financial picture, and kept asking for more information. They got most of what they asked for, at least until late 2014, but often not promptly or in the form they wanted. Their relationship with Mr. Minne continued to fray. Lawyers were called in. The Tracys called a meeting for May 2014 at a law office in Terre Haute. The Minnes, having asked that an April meeting be rescheduled to accommodate their travel schedule, didn't show. The Tracys voted to require Mr. Minne to fire Mr.

Rushenburg as Phoenix Pallet's accountant. The Tracys said they would find the next accountant, but no successor accountant provided services. After that meeting, Mrs. Minne conducted much of the email correspondence with the Tracys.

The Board met on June 16, and the Tracys continued to vent their complaints about the information they were getting. Mr. Minne had hired David Gray as a bookkeeper (Mr. Gray called himself the company comptroller), and Mr. Gray was telling Mrs. Tracy he couldn't get some of the information because the company had switched from Peachtree accounting software to Quickbooks. Mrs. Tracy was especially troubled by reports from Phoenix Pallet salesman Dustin Harding, and wanted to call his customers. Mr. Minne didn't want her to do that, and said he would fill out the salesman's reports. Mr. Gray eventually asked Mr. Minne to release him from having to deal with Mr. Tracy.

In his trial testimony, Mr. Gray explained the difficulties he encountered. When Phoenix Pallet began, the Tracys had insisted that the business use the Peachtree accounting program. Mrs. Madison was unfamiliar with the program and struggled to learn it. Eventually, Phoenix Pallet started using Quickbooks; although data could be ported from one program to the other, Mr. Gray chose to make the switchover manually so that he could balance the books. Mr. Gray devoted a good deal of his time to trying to recreate, for entry into the Quickbooks program, what had happened during the Peachtree years.

The Board met again to choose a new board of directors on December 29, 2014, by which time the relationship between the Tracys and Minnes consisted

almost exclusively of distrust. They talked about selling Phoenix Pallet to Blair Melvin, but didn't agree (Mrs. Tracy soon heard from her own customers that Mr. Melvin was buying Phoenix Pallet). It was agreed that Mrs. Tracy would review and sign outgoing checks (how she would do that from 240 miles away in Terre Haute wasn't explained at trial), and that the Board would have to approve all overtime.

Mr. Minne reported that Phoenix Pallet couldn't make its $25,000 payment to 1st Source Bank, and the bank would call its note and close the company without further investment. Mr. Minne and the Tracys both said they would put no more money into Phoenix Pallet. By this point, the shareholders couldn't even agree how to count votes: Mrs. Minne, owner of half the stock, thought she was half the votes; the Tracys, holders of two of the three director seats, thought they could outvote Mrs. Minne. As a result, they disputed who was on the Board after that meeting. Nor could the shareholders agree on what happened in that meeting; competing minutes were drawn up.

Phoenix Pallet hit its high water mark in sales in 2014, at $1,547,000, but lost $188,000.

## 2015

Phoenix Pallet's short and unprofitable life ended in the first weeks of 2015.

Mr. Minne told the Tracys in a phone call that he planned to make the January payment to the bank with money he expected customers to pay to

Phoenix Pallet in the coming week. Unbeknownst to Mr. Minne, the Tracys told the bank's loan officer that they would make the January payment if Phoenix Pallet didn't because they didn't want to company to shut down. The customer money didn't come in before payment was due, and Mr. Minne, believing the bank would soon call its note and Phoenix Pallet would be unable pay, decided to fold his (and the Tracys') tent. He notified the Tracys he was closing the company, though the board never voted to close or liquidate it.

Phoenix Pallet didn't make the payment due on January 15, and the bank made demand on its note by letter dated June 16. Mr. Minne's attorney sent the Tracys a letter dated January 19 saying that Mr. Minne was calling "all of his Notes" to Phoenix Pallet and demanding a payoff in an unstated amount. Mr. Minne now concedes he held only the note dated December 31, 2011. No further communication between the Tracys and the Minnes occurred after the Tracys received the lawyer's letter.

On January 21, apparently before learning that Mr. Minne was calling his note, the Tracys reported (by email) that they had gotten a letter from 1st Source Bank and asking what would be done about it. The letter in question can't be identified for certain on this record, but it would appear to be the bank's January 16 letter demanding payment. Mr. Minne responded, "Expecting some checks in. Plan on having it paid sometime next week." The Tracys asked Mr. Minne to tell the loan officer, and Mr. Minne responded, "yes. It is being handled."

Without telling the Tracys, Mr. Minne opened a Phoenix Pallet corporate checking account at Lake City Bank, into which he put payments from its

customers, and from which he paid Phoenix Pallet bills. Mr. Minne testified unconvincingly that he moved the Phoenix Pallet money to the Lake City Bank out of concern that governmental entity would swoop in and seize the money if he didn't. Mr. Minne paid off the 1st Source Bank loan in full after Phoenix Pallet's assets were liquidated, and paid creditors he thought needed to be paid. Mr. Minne testified that $26,400 remained in the Lake City Bank account, though the bank statement shows a balance of $123.21. Mr. Minne paid off a personal loan from Fifth Third Bank, wrote himself checks for $9,500, $32,000, $1,000 $5,000, and $1,400, cashed another $1,500 check written to cash, and wrote two $9,500 checks to Golf Properties. Mr. Minne didn't pay all the taxes Phoenix Pallet owed; a tax warrant has been issued against Mr. Minne and Mrs. Tracy for unpaid unemployment taxes in the amount of $52,516.36 with interest accruing at $331.61 every day.

CONCLUSIONS OF LAW

In Count I of their complaint, the Tracys assert a claim that the Minnes breached their fiduciary duty by maintaining a second set of books, improperly recording loans and repayments between Phoenix Pallet on the one hand and Mr. Minne and his associated businesses on the other, exercising purported rights as a secured creditor of Phoenix Pallet, and liquidating Phoenix Pallet. Count VI asserts a claim of deception against Mr. Minne only, based on keeping a second set of books, and knowingly presenting a false promissory note and security agreement. Count V alleges a fraud claim against Mr. Minne and a

constructive fraud claim against both defendants based on false representations of Phoenix Pallet's financial condition, status and affairs. Count VI asserts a claim against Mr. Minne for willful, reckless and gross negligence in the management, administration and supervision of Phoenix Pallet, based on pretty much everything asserted in count I, plus improper use of the property of Phoenix Pallet for the benefit of Mr. Minne and his other businesses.

In their counterclaim, the Minnes assert the following claims against the Tracys. Count I alleges fraud, specifically that the Tracys made false representations about the transfer of equipment to Phoenix Pallet. Count II alleges the Tracys engaged in constructive fraud by not telling the Minnes about the loan of the equipment. In Count III, the Minnes assert that the Tracys breached their fiduciary duties by failing to disclose the true nature of their contributions to Phoenix Pallet. Count V alleges that the Tracys made false and misleading written statements to the Minnes through the Phoenix Pallet records.

"[A] claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of that duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." Rapkin Group, Inc. v. Cardinal Ventures, Inc., 29 N.E.3d 752, 757 (Ind. Ct. App. 2015); *accord* Good v. Indiana Teachers Ret. Fund, 31 N.E.3d 978, 983 (Ind. Ct. App. 2015) (quoting York v. Fredrick, 947 N.E.2d 969, 978 (Ind.Ct.App.2011). "The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a closely held corporation. The fiduciary has a duty to deal fairly, honestly, and openly with his corporation and fellow stockholders

and must not be distracted from the performance of his official duties by personal interests." Rapkin Group v. Cardinal Ventures, 29 N.E.3d at 757 (citing G & N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 240 (Ind., 2001)).

Indiana's business decision rule has a strongly pro-management bias that includes "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." G & N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 238 (Ind. 2001). Negligence doesn't overcome the presumption; recklessness or willful misconduct is required. Id.

"To prove fraud, a plaintiff must establish the following elements: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage of which the plaintiff complains." Kesling v. Hubler Nissan, Inc., 997 N.E.2d 327, 335 (Ind. 2013) (quoting Lawyers Title Ins. Corp. v. Pokraka, 595 N.E.2d 244, 249 (Ind. 1992)); BSA Const. LLC v. Johnson, 54 N.E.3d 1026, 1031 (Ind. Ct. App. 2016) (internal citations omitted). "[T]he failure to disclose all material facts can also constitute actionable fraud." Kesling v. Hubler Nissan, Inc., 997 N.E.2d 327, 335 (Ind. 2013) (quoting Lawson v. Hale, 902 N.E.2d 267, 275 (Ind. Ct. App. 2009)).

"A claim for constructive fraud succeeds if the following five elements are established: 1) a duty owed by the party to be charged to the complaining party due to their relationship; 2) violation of that duty by the making of deceptive

material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party." Messmer v. KDK Financial Services, Inc., 83 N.E.3d 774, 781 (Ind. Ct. App. 2017) (citing Heyser v. Noble Roman's Inc., 933 N.E.2d 16, 19-20 (Ind. Ct. App. 2010).

A statutory claim for deception under Indiana law requires proof by a preponderance of the evidence that complainant suffered a pecuniary loss as a result of another person knowingly or intentionally making a false or misleading written statement with the intent to obtain property. Ind. Code § 35-43-5-3(a)(2).

*Conclusions of Law: Liability*

Several of the claims and aspects of the claims can be resolved without much discussion because the predicate facts weren't proven. First, there was no second set of Phoenix Pallet books. To the extent any of the Tracys' claims rest on phantom bookkeeping, they are unproven. Second, the Tracys haven't proven that either of the Minnes was responsible for false or deceptive entries in Phoenix Pallet's only set of books. Confusion crept in as Mrs. Madison tried to learn the Peachtree accounting system that was foreign to her, and again as Mr. Gray tried to switch the company back to Quickbooks, which categorizes income and outgo differently than Peachtree. And entries appear to have been made inconsistently as the bookkeeping responsibilities passed from one person to another. But to the extent any of the Tracys' claim rest on the proposition that the Minnes

generally engaged in willful, reckless, or gross negligence, or fraud, or deception in maintaining the financial records of Phoenix Pallet, those claims are unproven. Third, the Tracys have proven no facts that would make Mrs. Minne liable to them on any of their theories. Mrs. Minne hasn't been shown to have done anything other than hold shares through 2014, and no facts that were proven at trial come close to supporting a finding that anything she did or knew of in 2014 or 2015 amounted to constructive fraud or breach of her fiduciary duty to her co-shareholders.

Of the Tracys' claims, that leaves their claims against Mr. Minne for deception and breach of fiduciary duty. The deception claim is based on presentation of an invalid promissory note and security agreement; the Tracys contend that they were invalid because Phoenix Pallet's signature was provided by one serving in the capacity of a nonexistent office and because the board of directors didn't authorize it.

The court disagrees with the Tracys. By December 2011, Mr. Madison had served in the role of vice president for nearly two years, having been elected to that position by the board of directors. Whatever the bylaws might have said, Mr. Madison was the *de facto* vice-president. By December 2011, Mr. Minne and the Madisons had been working continuously without the direction of the Tracys. Mr. Madison ran the facility and ran the business when Mr. Minne was away; Mrs. Madison ran the office and put money in to keep things going and repaid herself; Mr. Minne ran the show, and had been hired specifically to put money into Phoenix Pallet as needed. The Tracys (who were focused on Mr. Tracy's

serious health problems) hadn't uttered a peep as Mr. Minne put money into Phoenix Pallet.

The Minnes contend the Mr. Madison had apparent authority to sign the note and security agreement on Phoenix Property's behalf. With respect to anyone on the planet apart from Mr. Minne, that would probably be true. If a principal makes some manifestation that leads a reasonable person to believe an agent has the authority to perform some act, the agent has apparent authority to bind the principal. Gallant Ins. Co. v. Davis, 751 N.E.2d 672 (Ind. 2001). But the Minnes concede they have found no authority under Indiana law to support the proposition that the principal's president can reasonably rely on the agent's apparent authority, and the court has no basis on which to predict how the Indiana Supreme Court would resolve that issue.

But Mr. Madison had inherent authority to sign the note and security agreement for Phoenix Pallet in December 2011. Inherent authority exists under Indiana law when an agent act acts within the usual scope of one in the same agency role, the contracting party reasonably believed that the agent was authorized to bind the principal through contract, and the contracting party wasn't on notice that the agent lacked such authority. See Menard, Inc. v. Dage-MTI, Inc., 726 N.E.2d 1206, 1213 (Ind. 2000). Mr. Minne knew Mr. Madison to be a holder of about one sixth of the company's shares, and Mr. Madison had been acting as the company's vice president for the entire year Mr. Minne had been involved with Phoenix Pallet. The Madisons and Mr. Minne's wife controlled two-thirds of the company's shares between them, and the other shareholders

had shown no interest in how Mr. Minne and Mr. Madison operated the business. Mr. Minne and Mr. Madison entered into a binding promissory note and created a legitimate security interest in Phoenix Pallet's asset to secure the note.

If none of this is right, the Tracys are estopped to deny Mr. Madison's authority to act as Phoenix Pallet's vice president. They elected him to that position when the company was formed, and signed company documents that Mr. Madison signed in his capacity as vice president. Notwithstanding the by-laws, the Tracys helped make Mr. Madison vice president and allowed him to identify himself in corporate papers. An assertion to the contrary simply comes too late.

Because the Tracys' deception claim is based on the proposition that Mr. Minne proceeded on an invalid note and agreement, the claim is unproven.

Nonetheless, Mr. Minne breached the fiduciary duty he owed to the Tracys when he failed to disclose the note and security agreement to the Tracys. As an officer of a close corporation, Mr. Minne owed the Tracys, as shareholders, a duty to deal fairly, honestly, and openly, Rapkin Group v. Cardinal Ventures, 29 N.E.3d at 757, and to act in the honest belief that the action taken was in Phoenix Pallet's best interests. G & N Aircraft v. Boehm, 743 N.E.2d at 238. Mr. Minne acted solely in his own interest. Granting himself a security interest in the money he already had put into the company gave his interest priority over investments by the Tracys and Madisons, who were shareholders. Mr. Minne argued that the note and security agreement benefitted Phoenix Pallet because he wouldn't have put any more money into the business without them, but the

evidence presented at trial doesn't support that contention. Phoenix Pallet couldn't benefit from the note and security agreement.

That Mr. Minne, as he says, never thought to tell the Tracys is easily believed in light of their lack of involvement after the Kokomo Cracker Barrel meeting. But the fiduciary duty doesn't ebb and flow with the extent of thought one gives it. Mr. Minne filed his note and security agreement in January 2012, but couldn't reasonably expect the Tracys to discover those papers as a result. Instead of telling the Tracys that he now held the only non-bank security interest in Phoenix Pallet's assets, Mr. Minne kept that security interest like an ace up his sleeve for three years. Had he told the Tracys, they, too, could have secured their equipment loan to Phoenix Pallet.

Mr. Minne breached his fiduciary duty to the Tracys as shareholders a second time when he shuttered the company and moved its liquid assets to the Lake City Bank account without notice to the Tracys. Mr. Minne testified to a memory that the Minnes and Tracys had agreed to close the company during the December 2014 meeting, but that memory can't be accurate because it's wholly inconsistent with what the Tracys did after that meeting. The Tracys had promised their loan officer at the bank that they would make the January loan payment if Phoenix Pallet didn't. They asked Mr. Minne to notify the 1st Source Bank loan officer that the January 2015 loan payment would be made. The Tracys wanted to sell the company, but they didn't want to company to close. That conduct belies Mr. Minne's memory that agreement had been reached at the December 2014 meeting to shut Phoenix Pallet down. The Tracys'

conversation with the bank, which was unknown to Mr. Minne, might well have been a breach of fiduciary duty on their behalf, but that's not part of this suit. It's pretty clear that by January 2015, the relationship between the Minnes and the Tracys had rotted to the point that nobody (except maybe Mrs. Minne) was being guided by their fiduciary duties to each other.

The court defers discussion of the Tracys' damages and turns to the Minnes' claims against the Tracys.

The facts found by the court don't support any of the Minnes' counterclaims. Count I (fraud), Count II (constructive fraud), and Count IV (deception) all rest on the proposition that the Tracys made false representations, or failed to disclose the truth about, their transfer of equipment at the birth of Phoenix Pallet. Neither proposition has been proven. Mr. Minne asked the Tracys about the equipment at the Kokomo Cracker Barrel meeting, and Mrs. Tracy told him the equipment was at the facility on a six percent loan. Regardless of what Mr. Minne might have come to believe before or after the Kokomo Cracker Barrel meeting, the Tracys told Mr. Minne the truth about their relationship to the equipment.

Count III of the counterclaim (breach of fiduciary duty) alleges, first, that the Tracys misrepresented their equipment as paid-in capital instead of a loan. As just discussed, that just didn't happen. Second, the Minnes allege that the Tracys failed to provide Mr. Minne with the corporate bylaws for more than a year. The Minnes don't explain why the Tracys might have had a fiduciary duty to produce the bylaws without a request, and no such reason occurs to the court.

Third, the Minnes say the Tracys bear the blame for failing to complete the tax returns. The Tracys insisted that Mr. Rushenburg be fired after the "second set of books" statement, and wanted authority to select Mr. Rushenburg's successor as accountant. They produced a name (Kathy Mains), but Ms. Mains wound up doing no accounting work for Phoenix Pallet. Finding an accountant, as the Tracys promised to do, is one thing, but making sure that accountant produces useful services is another. The Minnes haven't persuaded the court that the missed tax payment belongs at the Tracys' door.

The Minnes haven't proven any of their counterclaims.


*Conclusions of Law: Damages*

The only successful claim, then, is the Tracys' claim that Mr. Minne breached his fiduciary duty to them. The inquiry turns to damages. "Damages are ordinarily the proper remedy for a shareholder aggrieved by breach of director duty." <u>G & N Aircraft, Inc. v. Boehm</u>, 743 N.E.2d at 243. The Indiana Supreme Court explains that the "traditional powers of equity courts are available to fashion a remedy for breach of a fiduciary duty in a close corporation." <u>Id.</u> at 244. "[W]hen the basis of liability is a failure to conform to a fiduciary duty, the measure of damages is the entire loss sustained," <u>Bunger v. Demming</u>, 40 N.E.3d 887, 899 (Ind. Ct. App. 2015) (quoting <u>W & W Equip. Co. v. Mink</u>, 568 N.E.2d 564, 576 (Ind. Ct. App. 1991)), but the Indiana Supreme Court has "recognized the need for more flexible remedies in the case of close corporations." <u>G & N Aircraft, Inc. v. Boehm</u>, 743 N.E.2d at 244. "Doubts and uncertainties as to the

proof of the exact measure of damages must be resolved against the defendant because justice and public policy require that the wrongdoer bear the risk of uncertainty that his own wrong has created." Bunger v. Demming, 40 N.E.3d 887, 899 (Ind. Ct. App. 2015) (citing Lees Inns of Am., Inc. v. William R. Lee Irrevocable Trust, 924 N.E.2d 143, 160 (Ind. Ct. App. 2010)).

Mr. Minne's first breach of his fiduciary duty was acquiring, perfecting, and not directly disclosing his security interest in Phoenix Pallet's assets. Had he not done so, his interest wouldn't have had priority over the Tracys' interest: either they all would have been unsecured creditors, or the Tracys could have perfected their own security interest. Because Mr. Minne's breach is only thing that gave his interest priority over the Tracys, the damages analysis will proceed as if Mr. Minne's interest had no priority. Mr. Minne breached his fiduciary duty a second time by closing Phoenix Pallet and seizing control of its assets.

The parties provide the court with little to work with in fashioning a remedy. The Tracys want their entire investment back, with interest running from the years in which they made their investments. Notwithstanding Mr. Minne's breaches of his fiduciary duty, nothing in the record supports such a remedy. Mr. Minne's efforts, which weren't helped by anything the Tracys did, held off financial calamity for several years. The Tracys did nothing constructive to keep the business running after Mr. Minne joined Phoenix Pallet, and they point to no reason why all their money should be refunded.

The court might look to how much each side put into Phoenix Pallet. The court's rough calculations indicate that Mr. Minne put in about twice what the

Tracys put in,[1] but no truly equitable remedy would award Mr. Minne two-thirds of what was left when he closed Phoenix Pallet with neither authorization from, nor effective notice to, the Tracys.

The redemption agreement between the parties provided that upon liquidation, the proceeds of the liquidation were to be divided by stock ownership. The Tracys had half the stock and Mrs. Minne the other half. What took place wasn't a liquidation in the sense contemplated by the redemption agreement – in fact, it was a breach of fiduciary duty -- but the redemption agreement provides some guidance in fashioning a remedy. At the least, it sets a floor: Mr. Minne's breach of fiduciary duty shouldn't allow him to receive a greater share of the Phoenix Pallets assets than the redemption agreement would have allowed him.

But even an equal division gives Mr. Minne something he wouldn't have had without breaching his fiduciary duty. Had he notified the Tracys of his intent to close the business and sought their agreement, the redemption agreement

---

[1] The Tracys' investment is the easier to calculate: Phoenix Pallet had $99,613 worth of equipment for which it had never paid, and the Tracys put in another $68,900 in 2010 and $25,000 in 2013. The Tracys also made an indirect contribution to Phoenix Pallet by paying off an $11,000 credit card debt that was incurred before Mr. Minne invested. Setting aside interest, which Phoenix Pallet never paid to its officers or shareholders, and setting aside other debts, the Tracys would have been able to walk away from Phoenix Pallet's liquidation with $204,513.

What the Minnes put into Phoenix Pallet can't be said with similar certainty, because the company's financial records don't provide easy answers. In his opening statement, Mr. Minne pointed to the $565,305 that the December 31, 2014, balance sheet shows as the amount payable on Mr. Minne's note; Mr. Gray testified at trial that this was a net figure, but it's the best we've got. Assuming the figure's accuracy, Phoenix Pallet owed a total of $769,818 to the Tracys as shareholders and Mr. Minne as president of the company. Setting aside the security interest obtained through a breach of fiduciary duty, 67.4 percent of that indebtedness was owed to Mr. Minne, and 32.5 percent was owed to the Tracys.

would have been triggered and Mr. Minne would have been entitled to half the post-liquidation assets. For him to receive half despite not having effectively notified or sought the agreement of the Tracys would be inequitable.

The most equitable method to calculate damages to be awarded to the Tracys is to identify what Phoenix Pallet had when it closed and award the Tracys two-thirds of what Phoenix Pallet had. That division effectively resolves any uncertainty against Mr. Minne, the wrongdoer.

As the court reads Plaintiffs' Exhibit 25, Mr. Minne put a total of $83,800.74 into the Lake City account into which he testified he placed proceeds from Phoenix Pallets assets and accounts receivable. Mr. Minne used some of that money to pay creditors that he thought needed to be paid. It might be seen as inequitable to include those funds (which didn't go into Mr. Minne's pocket) in calculating damages he must pay to the Tracys, but those payments were part and parcel of Mr. Minne's second breach of fiduciary – liquidating Phoenix Pallet without meaningful notification to, or consent of, the Tracys.

Treating the Lake City Bank account as the conduit through which all the proceeds of Phoenix Pallet passed (after 1st Source Bank was paid off), two-thirds of those proceeds amount to $55,867.16, which becomes the damages award. The Tracys ask for prejudgment interest on that amount, but it wasn't a fixed sum until today, so Indiana law doesn't allow for prejudgment interest in the absence of an agreement between the parties. *See* Kosarko v. Padula, 979 N.E.2d 144, 146 (Ind. 2012). No credible evidence indicates that Mr. Minne ever agreed to pay the Tracys interest.

That leaves the matter of the tax warrant, which each side says the other should pay. The court doesn't understand why Mr. Minne believes the Tracys should pay it. Mr. Minne ran Phoenix Pallet despite the Tracys' increasingly obstructive conduct, and this record doesn't even hint that anyone other than Phoenix Pallet paid its earlier taxes, or that the Tracys ever were asked to do so. Mr. Minne points to the Tracys' insistence that they, and not Mr. Minne, find a new accountant when they insisted that Mr. Rushenburg be fired in the wake of the "second set of books" comment. The Tracys selected Kathy Mains to be the new accountant, but the communications between Mr. Minne and the Tracys were so shredded that no one can say just what, if anything, Ms. Mains did. In any event, insistence on selection of an accountant isn't a guarantee of the accountant's performance.

Mr. Minne was in charge of Phoenix Pallet's day-to-day operation when the tax obligation was incurred. He testified at trial that he held back $26,400 from the Lake City Bank account for tax liabilities, indicating that he recognized that he was at least partly responsible for unpaid tax obligations. As between the Tracys and Mr. Minne, responsibility for the taxes was Mr. Minne's.

Of course, the taxes weren't payable to the Tracys, so they can't be included in the damages award. The judgment will require Mr. Minne to hold the Tracys harmless on the $52,516.36 tax warrant against Mr. Minne and Mrs. Tracy for unpaid unemployment taxes.

The court:

1. finds for plaintiffs Mona and Terah Tracy on their claim against defendant Paul Minne for breach of fiduciary duty;

2. finds for defendant Paul Minne on all other claims against him;

3. finds for defendant Jean Minne on all claims against her; and

4. finds for counter-defendants Mona and Terah Tracy on all claims against them in Paul and Jean Minne's counterclaim.

The clerk shall enter a money judgment for Mona and Terah Tracy and against Paul Minne in the amount of $55,867.16. The judgment shall further order Paul Minne to hold Mona Tracy harmless on the tax warrant against them for unpaid employment taxes. Costs shall be assessed the defendants.

SO ORDERED.

ENTERED: ___December 12, 2018___

_____/s/ Robert L. Miller, Jr._____
Judge, United States District Court